Domino Berns, OSB No. 080941
domino.berns@lasoregon.org
Noah Wallis, OSB 226764
noah.wallis@lasoregon.org
LEGAL AID SERVICES OF OREGON
621 SW Morrison St., Suite 900
Portland, OR 97205

Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Monet Gonnerman, OSB No. 224045
mgonnerman@oregonlawcenter.org
OREGON LAW CENTER
621 SW Morrison St., Suite 1450
Portland, OR 97205

Of Attorneys for Plaintiff, Gregory R. Hughes

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| GREGORY R. HUGHES,<br><br>                    Plaintiff,<br><br>v.<br><br>EK REAL ESTATE FUND I, LLC, a New York limited liability company, JARRED KESSLER, an individual,<br><br>                    Defendants. | Case No. 6:24-cv-01378-MC<br><br>SECOND AMENDED COMPLAINT<br><br>Abuse of a vulnerable person (ORS § 124.110), Aiding and abetting abuse of a vulnerable person (ORS § 124.110), Declaratory relief, Truth in Lending Act as amended by Home Ownership and Equity Protection Act (15 U.S.C. §§ 1635, 1639, 1639b, 1639c); Fraudulent Filing of Information Return (26 U.S.C. § 7434).<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.　　This case arises from a predatory mortgage transaction in which Defendants, EK Real Estate Fund I, LLC ("Defendant EK") and Jarred Kessler ("Defendant Kessler"), took the title of a disabled, low-income man's home in a sale-leaseback scheme in exchange for grossly inadequate consideration.

2.　　The transaction now threatens Plaintiff, Gregory R. Hughes, with the loss of his home of nearly two decades. It is only a matter of time before Mr. Hughes loses his home because the transaction requires that he make monthly payments that far exceed his monthly income.

3.　　Defendants wrongfully wrested the ownership of Mr. Hughes' home from him, thereby violating Oregon Revised Statutes ("ORS") §§ 124.100 *et seq.*, which prohibits financial abuse of a vulnerable person. As a result, Mr. Hughes is entitled to damages.

4.　　Additionally, Defendant EK failed to comply with the requirements of the Truth in Lending Act ("TILA"), as amended by the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1601 *et seq.*, thereby giving Mr. Hughes a right pursuant to 15 U.S.C. § 1635(a) and (f) to rescind the transaction for three years after its consummation.

5.　　Mr. Hughes is also entitled to damages based on Defendant EK's violations of TILA for violations of 15 U.S.C. §§ 1635, 1639, 1639b, and 1639c.

6.　　Finally, Defendants willfully and fraudulently filed an information return in violation of 26 U.S.C. § 7434, entitling Mr. Hughes to damages.

7.　　Mr. Hughes brings this action to enforce his rights, including his right to rescind the transaction and to recover damages.

2-　　SECOND AMENDED COMPLAINT

**JURISDICTION AND VENUE**

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 in that this matter arises under TILA, 15 U.S.C. § 1601 *et seq*. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201.

9.      This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Mr. Hughes is a citizen of Oregon, the location of his primary residence. Defendant EK is a citizen of New York, where it is registered and has its principal place of business. Defendant Kessler is a citizen of New York, the location of his primary residence. The amount in controversy exceeds $75,000.00.

10.      Venue is proper in the District of Oregon, Eugene Division, as the transaction occurred and the property is located in Eugene, Oregon.

11.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal claims that they form part of the same case or controversy.

**PARTIES**

12.      Mr. Hughes is a 64-year-old disabled, low-income individual who is, and at all times relevant to this action has been, a citizen of Lane County, Oregon. He lives at 3037 Crocker Road, Eugene, OR 97404, the home at issue in this matter.

13.      Defendant EK is a Delaware limited liability company that is registered with the Oregon Secretary of State Corporation Division. Defendant EK's principal place of business is 111 W. 33rd St., New York, NY 10120. Defendant EK's sole member is a New York corporation called EasyKnock, Inc. ("EasyKnock").

3-      SECOND AMENDED COMPLAINT

14.     Defendant Kessler is an individual who resides, and at all relevant times resided, in New York.

**FACTUAL ALLEGATIONS**

**A.     Background on Plaintiff**

15.     In 2006, Mr. Hughes purchased his home.

16.     The legal description of the property is:

> Lot 10, EXCEPT the South 10.0 feet thereof, LOY'S ADDITION TO SANTA CLARA, as platted and recorded in Book 18, Page 6, Lane County Oregon Plat Records, in Lane County, Oregon.

17.     He strove to provide stability for himself and his family, paying off his mortgage and working various jobs over his career, including owning his own construction company.

18.     By 2014, Mr. Hughes owned his home outright, as he did at the time of the transaction at issue here.

19.     Mr. Hughes' home has immense sentimental value to him.

20.     He has put in many hours working on the house, including renovating it after a fire.

21.     Mr. Hughes had two daughters. Tragically, his eldest daughter died suddenly in an accident not long after he purchased his home. Further, Mr. Hughes' father passed away more recently. To Mr. Hughes, memories of those lost loved ones are intimately connected with the house. Mr. Hughes and his youngest daughter, Deven Hughes, both spent time with Mr. Hughes' eldest daughter and Mr. Hughes' father for the last time in the home.

22.     Mr. Hughes is now disabled.

23.     In 2016, Mr. Hughes suffered from an intense health emergency.

24.     He suffered from respiratory failure as a result of Guillain-Barré syndrome and other health complications. He had fluid around his heart and lungs and did not receive enough oxygen to

4-          SECOND AMENDED COMPLAINT

his brain. He was sedated, intubated, transferred to the Intensive Care Unit, admitted for an extended hospitalization—from August 24, 2016, to September 14, 2016—and operated on repeatedly.

25.     Mr. Hughes has never been the same mentally or physically since the medical crisis. Physically, he worked with physical and occupational therapists to regain basic functioning in his face and arms, with delayed and limited success regaining strength and balance in his lower extremities.

26.     Mentally, his cognitive ability declined starkly. His memory is limited, he gets frustrated easily, he is unable to navigate even the most mildly complicated situations, and he has a hard time understanding things.

27.     Following the health emergency, Mr. Hughes' ability to work has been extremely limited. He has not held a stable job since.

28.     In 2017, the Social Security Administration declared him disabled based on his array of health conditions.

29.     At all relevant times, Mr. Hughes has suffered from Guillain-Barré syndrome, depression, PTSD, anxiety, and memory and cognitive problems.

30.     Mr. Hughes is extremely low income. Since 2017, Mr. Hughes has received monthly benefits from the Social Security Administration. At the time of the transaction at issue, Mr. Hughes survived off of $784 per month in Social Security benefits. Mr. Hughes' severely limited income put him below the federal poverty guideline. Mr. Hughes now receives $1,114 per month in Social Security benefits. He also receives food stamps in the amount of $67 per month.

31.     In other words, Mr. Hughes was and is a low-income, disabled homeowner.

32.     In 2021, around the time of the transaction at issue, due to his cognitive disabilities, Mr. Hughes fell prey to many scams. For example, his bank refused to issue him a

new debit card and threatened to close his account because there were so many unauthorized transactions on the account.

33.     Anyone who interacted with Mr. Hughes even briefly at that time would have been able to see his lack of mental faculty.

34.     In 2021, due to his low income, Mr. Hughes had fallen behind on his Lane County property taxes. He owed approximately $7,074.56 in past-due taxes for 2018 through 2020 and would owe additional taxes for the year 2021.

35.     On June 23, 2021, Lane County mailed Mr. Hughes a Notice of Foreclosure, beginning the foreclosure process. The notice advised that, as of July 15, 2021, Mr. Hughes would owe $7,829.90 to Lane County in past-due property taxes. The notice further provided the foreclosure timeline: on July 22, 2021, Lane County would mail the Certified Notice of Foreclosure; on August 19, 2021, would be the publication of real properties; on September 21, 2021, Lane County would file the judgment and decree in the circuit court, and Mr. Hughes would incur nine percent daily interest thereafter.

36.     The notice advised Mr. Hughes of ways to stop the foreclosure process at different points in time, including making the full payment of past-due taxes and interest by August 5, 2021, to avoid a five percent penalty, or by making a full payment of past-due taxes, interest, and five percent penalty by September 19, 2021.

37.     In addition, around the same time, Mr. Hughes was alarmed by what he suspected was elder financial abuse being perpetrated against his mother and wished to retain an attorney for her protection.

38.     Without significant savings and in an effort to pay off his property taxes, prevent foreclosure on his home of approximately 15 years, and assist his aging mother, Mr.

SECOND AMENDED COMPLAINT

Hughes tried to get a modest home equity line of credit ("HELOC"), requesting only $15,000.

He did not want or need more. A low credit score and insufficient income, however, prevented

him from obtaining one.

**B.    Background on Defendant**

39.    In 2016, Ben Black and Defendant Kessler co-founded a company called EasyKnock.

Defendant Kessler is the Chief Executive Officer.

40.    EasyKnock expanded its reach around the country through a complex corporate web

of interconnected business entities, including Defendant EK; Easyknock Inc. HQ; EK Real Estate

Services of NY, LLC; EKRE of FL, LLC; EK Re Fund 1 LLC; EK Real Estate Avenue Fund 1 LLC;

EKRE of TX LLC; EK Real Estate Services, LLC; and EKRE of AZ LLC.

41.    In 2019, Defendant EK was formed. Defendant EK first applied for authority to

operate in Oregon in 2020.

42.    Ben Black and Defendant Kessler were co-presidents of Defendant EK. Defendant

Kessler came up with the idea of EasyKnock's scheme and was intimately involved in its execution

with Defendant EK.

43.    In his previous job, Defendant Kesser was accused by the Financial Industry

Regulatory Authority ("FINRA") of setting up a system of improper oversight in connection to his

sales role. He resigned from the position months before starting EasyKnock. Instead of learning from

the experience, Defendant Kessler implemented the same strategy with EasyKnock. He intentionally

structured the predatory mortgages into multi-part transactions in order to avoid the oversight that

applies to mortgage lenders.

44.    At all relevant times, EasyKnock was the sole member of Defendant EK.

45.    EasyKnock and Defendant EK offered predatory mortgage loans like the transaction

SECOND AMENDED COMPLAINT

at issue in this case to low-income individuals around the country. EasyKnock and Defendant EK refer to the transaction as "Sell & Stay."

46.    EasyKnock advertised that homeowners could access their home equity and "Avoid Lender Restrictions." EasyKnock stated on its website that, in qualifying for the loan, homeowners should "Forget Credit Score or DTI [debt-to-income] Requirements" and that "Credit scores and debt-to-income (DTI) ratios don't hold you back with EasyKnock's solutions."

47.    On information and belief, Defendant EK's agents and representatives assured financially distressed homeowners that they will be able to keep their home and merely "unlock the equity" in it.

48.    Notwithstanding its attempts to avoid lender restrictions, Defendant EK, through its member EasyKnock, established partnerships to advertise its services through online loan marketplaces such as LendingTree.com.

49.    EasyKnock, Defendant EK, and Defendant Kessler preyed on homeowners, like Mr. Hughes, with below-average credit and income but with significant home equity. They collaborated to get homeowners to enter into what are effectively predatory loans.

50.    Through the "Sell & Stay" transaction, Defendants offer homeowners a moderate loan, often less than one third of the value of the house. In exchange, Defendant EK takes title to the home. The homeowner then has the option to repay the loan for an exorbitant option price far higher than the amount of the loan. The homeowner must also make monthly payments, labeled as "rent," in order to remain in the home. Those monthly payments do not pay down the amount owed to regain title but instead are necessary to avoid immediate eviction. Each year, both the option price and the monthly payments increase.

51.    On information and belief, each "Sell & Stay" transaction involves the following

8-    SECOND AMENDED COMPLAINT

interrelated documents:

      a.      A sales agreement pursuant to which Defendant EK purports to

purchases the homeowner's home;

      b.      A lease agreement pursuant to which Defendant EK leases the home

back to the homeowner; and

      c.      An option agreement granting the homeowner an option to repurchase the

home from Defendant EK or to have it sold to a third party.

52.      On information and belief, each sales agreement states as the purchase price an amount that approximates fair market value of the home. But Defendant EK generally deducts from this amount an option fee of between 25% and 55% of the purchase price and additional exorbitant fees, with the result that the amount advanced by Defendant EK as the principal mortgage loan is far below the purchase price.

53.      On information and belief, each transaction:

      a.      Provides that the "rent" increases each lease year by the greater of 2.5% or

the change in the regional Consumer Price Index for Consumer Price Index for

All Urban Consumers.

      b.      Provides either that the option exercise price increases each year by the

greater of 2.5% or the changes in the regional Consumer Price Index for

Consumer Price Index for All Urban Consumers.

54.      EasyKnock has claimed that it is the "15th-largest owner of single-family homes in the United States," operating in 40 states. *See* Caitlin Thompson, *'Sale- Leasebacks' Offer to Help Homeowners Needing Cash. Some Lose Thousands*, NPR (June 18, 2024), *available at*

      SECOND AMENDED COMPLAINT

https://www.npr.org/2024/06/18/nx-s1-4851871/sale-leaseback-company-easyknock-cash#:~:text=Kessler%20says%20EasyKnock%20is%20the,for%20its%20services%20to%20EasyKnock.

55.    EasyKnock boasted that in 2023 alone, it acquired about 800 single-family homes with this scheme. *See* Sarah Marx, *EasyKnock Closes Another Funding Round*, HOUSINGWIRE (Feb. 28, 2024), *available at* https://www.housingwire.com/articles/easyknock-closes-another-funding-round/.

56.    Defendant EK actually owns a substantial portion of those homes all around the country, including in Alabama, Arkansas, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming.

57.    Following NPR reporting, a Congressional investigation, and a crackdown by states' attorneys general, in December 2024, EasyKnock announced its sudden closure. *See* Caitlin Thompson, *Senators Launch Probe into Sale-Leaseback Company, Citing NPR's Reporting*, NPR (Dec. 17, 2024), *available at* https://www.npr.org/2024/12/17/nx-s1-5231828/easyknock-senate-probe-sale-leaseback; *see also* Michigan Department of Attorney General, *AG Nessel Takes Action Against EasyKnock for Deceptive Business Practices* (May 22, 2024), *available at* https://www.michigan.gov/ag/news/press-releases/2024/05/22/ag-nessel-takes-action-against-easyknock-for-deceptive-business-practices; EINPresswire, *Attorney General Tong Announces Investigation into EasyKnock Over Deceptive Home Sale-Leaseback Deals* (Mar. 7, 2024), *available*

SECOND AMENDED COMPLAINT

*at* https://www.einpresswire.com/article/694148179/attorney-general-tong-announces-investigation-into-easyknock-over-deceptive-home-sale-leaseback-deals; Office of the Attorney General, *AG Campbell Reaches Settlement with Real Estate Company EasyKnock to Resolve Allegations of Unfair and Deceptive Conduct* (Dec. 5, 2023), *available at* https://www.mass.gov/news/ag-campbell-reaches-settlement-with-real-estate-company-easyknock-to-resolve-allegations-of-unfair-and-deceptive-conduct.

58.     Upon information and belief, EasyKnock then transferred many of its assets to Defendant EK.

**C.     Transaction**

59.     In 2021, after Mr. Hughes failed to secure a HELOC and was facing property-tax foreclosure, EasyKnock contacted Mr. Hughes with an offer of money as part of the transaction at issue. EasyKnock passed Mr. Hughes on to an agent of Defendant EK. At all relevant times, Mr. Hughes was not represented by an attorney.

60.     Mr. Hughes is disabled and an unsophisticated consumer.

61.     Mr. Hughes told EasyKnock and Defendant EK that he was unable to obtain a HELOC and why: he had a low credit score and insufficient income.

62.     Mr. Hughes told EasyKnock and Defendant EK that he wanted to remain in his home and retain ownership of the property.

63.     In July and August of 2021, Mr. Hughes and Defendant Kessler, the co-founder of EasyKnock and acting on Defendant EK's behalf, entered into a multi-part transaction.

64.     The transaction consisted of documents titled "Residential Real Estate Sales Agreement," "Amendment to Purchase Agreement," "Residential Lease Agreement," and

11-     SECOND AMENDED COMPLAINT

"Residential Real Estate Option Agreement", together with a "Transaction Risk Factors" document.

65.     The parties signed the "Residential Lease Agreement," and "Residential Real Estate Option Agreement" on August 25, 2021, consummating the transaction.

66.     Defendant Kessler signed the documents for Defendant EK.

67.     Through the multi-part transaction, Mr. Hughes received $90,206.19 in cash, Defendant EK paid $8,544.62 (one payment of $1,315.48 and another of $7,229.17) toward Mr. Hughes' past-due county property taxes, and Defendant EK paid $554.99 to cover Mr. Hughes' debt to Professional Credit. In total, Mr. Hughes received a benefit of $99,305.83.

68.     In exchange, Mr. Hughes transferred the title to his home to Defendant EK.

69.     At the time of the transaction, Defendant EK valued the house at $343,200.00, as stated in the Residential Real Estate Sales Agreement. Upon information and belief, the market value of the house was approximately the same.

70.     On August 25, 2021, Defendant EK took out a mortgage, secured by Mr. Hughes' home, for $161,000 from Temple View Capital Funding LP. Upon information and belief, Defendant EK used the proceeds from the mortgage—the difference between the mortgage amount and the amount paid to Mr. Hughes—to reinvest in the purchase of other properties swindled from low-income homeowners.

71.     Mr. Hughes remained in the home, but the loan was a trap. Defendant EK charged Mr. Hughes ever-increasing monthly "rent" starting at $1,580.00 per month and allowed Mr. Hughes the ever-increasing option to pay to get back title to the home starting at $160,437.00.

72.     In sum, Mr. Hughes received a loan of slightly less than $100,000. Defendants

received title to his home. In order to pay back his loan and regain title to his house, as of the day after the consummation of the transaction, Mr. Hughes would have to pay over $160,000. That is over $60,000 in interest accrued on the first day, or 61 percent of the loan. That amount would increase annually. Additionally, Mr. Hughes would also have to make monthly payments that were more than double his monthly income ($784 in Social Security benefits at the time). The monthly payments would increase regularly. Those monthly payments would not pay down the amount owed to regain title but instead were necessary to avoid immediate eviction.

73.    Again, Defendant EK valued the property at $343,200.00, and listed the "purchase price" in the "Residential Real Estate Sales Agreement" as such. Defendant EK's full explanation of the transaction is as follows:

a.    Defendant EK paid Mr. Hughes a $1,000.00 deposit;

b.    Defendant EK paid Mr. Hughes $89,206.19 in additional cash;

c.    Defendant EK paid $7,229.17 towards Mr. Hughes' past-due county property taxes;

d.    Defendant EK paid $1,315.48 in prorated county property taxes for January 1, 2021, to August 25, 2021;

e.    Defendant EK paid $554.99 to Professional Credit in connection with outstanding charges related to Mr. Hughes' first mortgage;

f.    Defendant EK subtracted $12,012.00 from the purchase price in "processing fees" payable to Defendant EK;

g.    Defendant EK subtracted $44,420.00 from the purchase price in repair holdback and rent holdback: $6,500.00 was purportedly set aside for minor repairs to Mr. Hughes' house; $37,920.00 covered twenty-four months of "rent"

payable to Defendant EK at $1,580.00 per month;

h.      Defendant EK subtracted $1,580.00 from the purchase price for

September 2021 "rent," payable to Defendant EK;

i.      Defendant EK subtracted $356.77 from the purchase price for August

2021 prorated "rent," payable to Defendant EK;

j.      Defendant EK subtracted $2,325.40 from the purchase price in

settlement charges: $325.00 for title services and lender's title insurance,

$650.00 in settlement or closing fees to ClearEdge Title, Inc, $1,064.40 in

owner's title insurance to ClearEdge Title, Inc., and $304.00 in government

recording charges;

k.      Defendant EK subtracted $183,200.00 from the purchase price in an

inflated option value. The original option exercise price was $160,437.00.

l.      Mr. Hughes was not given the option whether or not to accept all of the

subtractions and deductions; they were required terms of the contract. Added

together, those listed payments, fees, charges, and the option value, equal

$343,200.00.

74.     Put differently, even though Defendant EK loaned Mr. Hughes a mortgage of

approximately $100,000.00, secured by the title to his home, Defendant EK nonetheless held

themselves out to have purchased the house for $343,200.00, taking into account the various fees

and the option value.

75.     Upon information and belief, Defendant EK reported to ClearEdge Title, Inc., that it

had purchased the house for $343,200.00. In other words, if Defendant EK sold the house in the

future, Defendant EK would claim the tax benefits based on a sale of $343,200.00 and avoid the tax

14-          SECOND AMENDED COMPLAINT

consequences associated with a lower purchase price. As a result, Mr. Hughes received the tax form 1099-S listing the gross proceeds of the sale as $343,200.00.

76.    The "rent" Defendants charge Mr. Hughes has increased as of September 1, 2024, up to $1,632.14, a figure even more unaffordable than the amount that Defendants charged him at first.

77.    The option exercise price increases annually.  The original option exercise price, should Mr. Hughes have exercised it the day after the consummation of the transaction, was $160,437.00. It has now increased by an additional $12,336.11 from annual augmentations.

78.    In January 2024, Mr. Hughes and Defendant EK entered into an Option Exercise Price Amendment agreement. Because Mr. Hughes had fallen behind on "rent" due to his low income, Defendant EK added $17,637.00 to Mr. Hughes' option price, putting Mr. Hughes' ability to repurchase his home even further out of reach. That amendment covered Mr. Hughes' monthly payments from October 2023 through August 2024.

79.    Because Mr. Hughes' monthly payment is well above his gross monthly income, Mr. Hughes has again fallen behind on "rent." For every month of unpaid "rent," Defendants charge a five percent late fee, now $81.61. According to Defendants, as of March 31, 2025, Mr. Hughes owed $12,549.25 in unpaid "rent" and late fees.

80.    According to Defendants, as of March 31, 2025, Mr. Hughes owed $202,959.36 on his loan. That is the amount Mr. Hughes would need to pay under the terms of the contracts to regain title to his house today. That is over double the amount of the original loan, or 100 percent interest in less than four years. Broken down, according to Defendants, Mr. Hughes owed $160,437.00 as the original option exercise price, $12,336.11 from three annual increases to that amount, $17,637.00 from the option amendment that Mr. Hughes and Defendant EK

15-    SECOND AMENDED COMPLAINT

entered into in January 2024, and $12,549.25 in past-due monthly payments.

81.    In January 2025, Defendant EK, through its property manager, moved to evict Mr. Hughes from his home. Thanks to the intervention of Mr. Hughes' counsel, he remains in his home.

82.    Defendant Kessler and Defendant EK knew or should have known that the monthly payment, labeled as "rent," was unaffordable for Mr. Hughes, given his limited income.

83.    Defendant Kessler and Defendant EK knew or should have known that Mr. Hughes would not be able to afford to repurchase his home at the ever-increasing option price. Defendants never acknowledged to Mr. Hughes that they knew or should have known that Mr. Hughes would not be able to afford to repurchase his home.

84.    On July 29, 2024, Mr. Hughes sent written notice to Defendant EK by regular and Priority Express mail that he was exercising his right of rescission. A true and correct copy of this rescission letter is attached as Exhibit A.

85.    On July 31, 2024, Defendant EK received the rescission notice but failed to honor Mr. Hughes' right of rescission, as required by Section 1635(b) of TILA.

86.    The transaction constituted a wrongful taking of Mr. Hughes' property. As a result of the wrongful taking of Mr. Hughes' property, he has suffered severe emotional distress.

87.    Following the transaction, Mr. Hughes' daughter, Deven Hughes, became aware that Mr. Hughes had signed some documents and began to review the status of his financial affairs.

88.    Mr. Hughes and his daughter were overwhelmingly distraught when the

16-    SECOND AMENDED COMPLAINT

magnitude of the scheme became apparent.

89.    Mr. Hughes came to understand that, according to Defendants, he had sold his

house for approximately $100,000.00.

90.    Because his only income is Social Security benefits, which were never going to

cover the charged "rent" or the option exercise price, he could lose his house and become

homeless. The house has immense emotional significance to him, the only constant in his life

through multiple tragedies.

91.    Over the subsequent months and years, Mr. Hughes endured extreme stress, pain,

and suffering as a result of the transaction. He has experienced anxiety, depression, nausea,

anger, irritability, sleeplessness, decreased self-esteem, and a decreased desire to socialize.

92.    He has lost decades-long friendships and suffered the deterioration of other

relationships.

93.    He has feared that he will not be able to pass on the financial legacy of his home

to his daughter.

94.    He has felt sad, humiliated, shocked, moody, discouraged, embarrassed,

preoccupied, exhausted, overwhelmed, uptight, lethargic, stressed, tense, troubled, victimized,

inferior, disappointed, ashamed, nervous, scared, mistreated, and frustrated.

95.    His heartache has been evident to those around him. Because of the emotional

weight from the transaction, Mr. Hughes has said things to his daughter like, "Maybe the world

would be better without me."

///

///

///

17-      SECOND AMENDED COMPLAINT

## PLAINTIFF'S FIRST CLAIM FOR RELIEF

### Financial Abuse of a Vulnerable Person – Against Defendant EK
### ORS § 124.110

96.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

97.    Defendant EK took Mr. Hughes' property when it took title to his house, subject to an option.

98.    The taking diminished Mr. Hughes' property interest because Mr. Hughes no longer held title, free and clear from a mortgage, to his house. In other words, Mr. Hughes no longer has a complete ownership interest in his home.

99.    Defendant EK took real property: the property at 3037 Crocker Road, Eugene, OR 97404.

100.    Mr. Hughes was and is a vulnerable person. At all relevant times, due to his disabilities, Mr. Hughes has been a "person with a disability who is susceptible to force, threat, duress, coercion, persuasion or physical or emotional injury because of the person's physical or mental impairment," pursuant to ORS § 124.100(1)(e)(D).

101.    Mr. Hughes was and is a person with a disability. His mental impairments are likely to continue without substantial improvement indefinitely, for no fewer than twelve months. Further, his mental impairments prevent him from performing substantially all of the ordinary duties of occupations in which an individual not having the physical or mental impairment is capable of engaging, having due regard to Mr. Hughes' training, experience, and circumstances.

102.    Mr. Hughes experienced an intense health crisis in 2016. His health

18-    SECOND AMENDED COMPLAINT

conditions—including Guillain-Barré syndrome, depression, PTSD, anxiety, and memory and cognitive problems—are ongoing and will not substantially improve. Since 2016, Mr. Hughes has not held a regular job. The Social Security Administration declared Mr. Hughes disabled because his impairments prevent him from performing substantially all of the ordinary duties of occupations in which an individual not having the impairments is capable of engaging, having due regard to Mr. Hughes' training, experience, and circumstances.

103.   Mr. Hughes is susceptible to force, threat, duress, coercion, persuasion, and/or physical or emotional injury because of his mental impairments. Following Mr. Hughes' health crisis in 2016, he has experienced cognitive and mental decline. His mental impairments have rendered him vulnerable to coercion and persuasion, such as through financial scams. His memory is limited, he gets frustrated easily, he is unable to navigate even the most mildly complicated situations, and he has a hard time understanding things. Around the time of the transaction, for example, his bank refused to issue him a new debit card and threatened to close his account because there were so many unauthorized transactions on the account. At the time of the transaction at issue, Mr. Hughes did not understand the nature of the multi-part scheme and was susceptible to Defendants' coercion and persuasion. He still does not fully understand the transaction to this day, due to his mental impairments.

104.   Defendant EK's taking was wrongful. It was carried out by improper means because the taking was executed through misrepresentation and in violation of statutes, such as TILA (as outlined in Claims Three through Ten) and Oregon's Unlawful Trade Practices Act ("OUTPA").

105.   Defendant EK violated the OUTPA.

106.   Defendant EK is a foreclosure consultant. Defendant EK, Defendant Kessler,

SECOND AMENDED COMPLAINT

and Defendant EK's other agents made an offer to Plaintiff, a homeowner, to perform a service that will prevent, postpone, or stop a foreclosure sale with the intent to receive compensation. *See* ORS § 646A.702(3), (5).

107.    Lane County had initiated the foreclosure process against Mr. Hughes based on his past-due property taxes.

108.    Defendant EK knew about the pending foreclosure. Defendant EK offered to pay off the past-due taxes.

109.    Defendant EK received compensation by taking title to a valuable piece of property.

110.    ORS § 646A.710 requires that any services a foreclosure consultant provides to a homeowner be in writing and be provided at least 24-hours before the homeowner signs the contract. The writing must "[f]ully disclose the terms and total amount of any compensation the foreclosure consultant or a person working in association with the foreclosure consultant is to receive[,]" "[b]e dated and personally signed by the homeowner and the foreclosure consultant[,]" [c]ontain on the first page the name and address, facsimile number and electronic mail address of the foreclosure consultant to which a notice of cancellation may be delivered[,]" and "[c]ontain, in immediate proximity to the space reserved for the homeowner's signature, a notice" as outlined in the statute. ORS § 646A.710(1). Defendant EK did not comply with those requirements.

111.    The taking of Mr. Hughes' property constitutes financial abuse of a vulnerable person under ORS § 124.110 and has resulted in economic damages to Mr. Hughes in the amount of at least $103,653.53. According to Defendants, Mr. Hughes owes at least $202,959.36 to repay the loan. The principal on the loan is $99,305.83, the amount of money that Defendants

lent him in cash payments and towards past-due property taxes. Mr. Hughes now allegedly owes $103,653.53 in interest, over 100 percent of the principal. Because Mr. Hughes now owes $202,959.35 on the loan, his economic damages are $103,653.53 (the difference between what he owes and the principal).

112.     Pursuant to ORS § 124.100(2)(a), Mr. Hughes is entitled to the greater of (a) an amount three times his economic damages ($103,653.53), or $310,960.59, or (b) $500.00.

113.     As a result of Defendant EK's financial abuse of a vulnerable person, Mr. Hughes has suffered severe emotional distress. For example, he has experienced anxiety, depression, nausea, anger, irritability, sleeplessness, decreased self-esteem, and a decreased desire to socialize. He has felt sad, humiliated, shocked, moody, discouraged, embarrassed, preoccupied, exhausted, overwhelmed, uptight, lethargic, stressed, tense, troubled, victimized, inferior, disappointed, ashamed, nervous, scared, mistreated, and frustrated. Mr. Hughes has said things to his daughter like, "Maybe the world would be better without me."

114.     Mr. Hughes is entitled to emotional harm damages in an amount to be determined at trial. Mr. Hughes is entitled to an amount equal to three times those damages pursuant to ORS § 124.100(2)(b).

115.     Pursuant to ORS § 124.120(2), Mr. Hughes is entitled to rescission of the transaction and a declaration that he is not liable for any fines and fees, interest, "rent," or lease-related charges.

116.     Mr. Hughes is also entitled to punitive damages because Defendant EK acted with malice and/or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety, and welfare of others. *See* ORS § 31.730(1). Defendant Kessler created EasyKnock's and Defendant EK's multi-part scheme

21-          SECOND AMENDED COMPLAINT

with the purpose of avoiding regulatory oversight that applies to the mortgage lending industry. EasyKnock advertised that homeowners could access their home equity and "Avoid Lender Restrictions." EasyKnock stated on its website that, in qualifying for the loan, homeowners should "Forget Credit Score or DTI [debt-to-income] Requirements" and that "Credit scores and debt-to-income (DTI) ratios don't hold you back with EasyKnock's solutions." Defendant EK knew that Mr. Hughes had an extremely low income and a low credit score because he told them. In other words, Defendant EK knew or should have known that Mr. Hughes would never be able to afford the option price or monthly "rent" and, thus, that it was highly likely if not foregone that the transaction would render him homeless. Further, anyone who interacted with Mr. Hughes even briefly at that time would have been able to see his lack of mental faculty. Accordingly, Defendant EK knew or should have known that Mr. Hughes was a vulnerable person. Yet Defendant EK nonetheless forged ahead with the predatory loan. Additionally, Defendant EK and its member, EasyKnock, are now taking steps to avoid accountability. EasyKnock has quietly closed its doors to avoid a Congressional inquiry and public scrutiny. Further, upon information and belief, EasyKnock and its corporate web are moving assets around to continue to benefit from the financial abuse that they have enacted and to avoid accountability.

117.    Mr. Hughes is entitled to reasonable attorney's fees pursuant to ORS § 124.100(2)(c).

**PLAINTIFF'S SECOND CLAIM FOR RELIEF**

**Aiding and Abetting Financial Abuse of a Vulnerable Person – Against Defendant Kessler ORS § 124.110**

118.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

119.    Defendant Kessler facilitated Defendant EK's taking of Mr. Hughes' property.

22-    SECOND AMENDED COMPLAINT

He came up with the predatory mortgage scheme and implemented its execution, leading both EasyKnock and Defendant EK. He signed the documents transferring title from Mr. Hughes to Defendant EK.

120.    The taking diminished Mr. Hughes' property interest because he no longer held title, free and clear from a mortgage, to his house. In other words, Mr. Hughes no longer has a complete ownership interest in his home.

121.    Defendant Kessler facilitated the taking of real property: the property at 3037 Crocker Road, Eugene, OR 97404.

122.    Mr. Hughes was and is a vulnerable person. Mr. Hughes realleges paragraphs 100 to 103.

123.    Defendant Kessler is an experienced businessman. He engineered the predatory scheme in order to "Avoid Lender Restrictions" and the requirements of statutes like TILA. The taking was wrongful because it was carried out by improper means because the taking was executed through misrepresentation and in violation of statutes. Mr. Hughes realleges paragraphs 104 to 110.

124.    The taking of Mr. Hughes' property constitutes financial abuse of a vulnerable person under ORS § 124.110 and has resulted in economic damages to Mr. Hughes in the amount of at least $103,653.53. According to Defendants, Mr. Hughes owes at least $202,959.36 to repay the loan. The principal on the loan is $99,305.83, the amount of money that Defendants lent him in cash payments and towards past-due property taxes. Because Mr. Hughes now owes $202,959.36 on the loan, his economic damages are $103,653.53 (the difference between what he owes and the principal).

125.    Pursuant to ORS § 124.100(2)(a), Mr. Hughes is entitled to the greater of (a) an

23-    SECOND AMENDED COMPLAINT

amount three times his economic damages ($103,653.53), or $310,960.59, or (b) $500.00.

126.    As a result of Defendant Kessler's financial abuse of a vulnerable person, Mr. Hughes has suffered severe emotional distress. For example, he has experienced anxiety, depression, nausea, anger, irritability, sleeplessness, decreased self-esteem, and a decreased desire to socialize. He has felt sad, humiliated, shocked, moody, discouraged, embarrassed, preoccupied, exhausted, overwhelmed, uptight, lethargic, stressed, tense, troubled, victimized, inferior, disappointed, ashamed, nervous, scared, mistreated, and frustrated. Mr. Hughes has said things to his daughter like, "Maybe the world would be better without me."

127.    Mr. Hughes is entitled to damages in an amount to be determined at trial. Mr. Hughes is entitled to an amount equal to three times those damages pursuant to ORS § 124.100(2)(b).

128.    Pursuant to ORS § 124.120(2), Mr. Hughes is entitled to rescission of the transaction and a declaration that he is not liable for any fines and fees, interest, "rent," or lease-related charges.

129.    Mr. Hughes is entitled to reasonable attorney's fees pursuant to ORS § 124.100(2)(c).

**PLAINTIFF'S THIRD CLAIM FOR RELIEF**

**Declaratory Relief – Against both Defendants**

130.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

131.    While the transaction here was ostensibly structured as a sale-and-lease-back scheme, in fact, it is what Oregon courts have long held to be an "equitable mortgage," or a sale disguised as a mortgage: the intent was that Mr. Hughes convey the property as security for the

fulfillment of an obligation.

132.    The transaction is an equitable mortgage.

133.    In Oregon, an entity may not avoid the legal consequences of its actions by disguising a mortgage transaction as something else.

134.    The intent of the transaction was that Mr. Hughes' home be conveyed and received as security for the fulfillment of an obligation. Numerous factors indicate this intent, including but not limited to the following:

a.    The business relationship of the parties arose out of Mr. Hughes' attempt to obtain funds secured by the equity in his home while being able to remain living there.

b.    The proceeds Mr. Hughes received from the transaction were grossly inadequate, dwarfed by the exorbitant price he paid (and continues to pay) to have obtained them. He received a total benefit of $99,305.83, including cash and funds to pay off a small debt as well as property taxes. Defendants, meanwhile, deducted from the purchase price an option fee, a processing fee, settlement charges, more than two years of rent payments, and a repair holdback. The initial option exercise price of $160,437.00 meant that on the day after the consummation of the transaction, Mr. Hughes would have had to pay $61,131.17 in interest for his $99,305.83 loan.

c.    The option exercise price is substantially below the property's market value.

d.    Mr. Hughes, an unsophisticated consumer, had no effective opportunity to bargain with Defendants concerning the terms of the transaction.

e.    At all times since the transaction Mr. Hughes has maintained possession and resided in the subject property.

25-    SECOND AMENDED COMPLAINT

f.      The lease agreement that the parties entered into required that Mr. Hughes pay "rent" that, on information and belief, was and is below market lease value.

g.      At the time Mr. Hughes entered into the transaction, his financial circumstances were dire, and he felt acute pressure to obtain cash to fend off property tax foreclosure and to pay for legal services to try to protect his then-87-year-old mother from financial abuse. The transaction is the functional equivalent of a home equity loan, advancing cash to homeowners, including Mr. Hughes, and effectively using their homes as collateral.

135.    Mr. Hughes is entitled to a declaration that the transaction at issue is an equitable residential home mortgage for all purposes of this action, including but not limited to for purposes of determining the parties' obligations, rights, and remedies under TILA, as amended by HOEPA (together, "the Act").

136.    Mr. Hughes is entitled to a declaration of his equitable ownership interest in the property.

## PLAINTIFF'S FOURTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1635

137.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

138.    TILA, as amended by HOEPA, protects consumers from unfair and deceptive mortgage lending practices by creditors. The Act is meant to protect consumers who enter into loans secured by the equity in their homes. 12 C.F.R. Part 1026 is the implementing regulation for TILA, commonly known as Regulation Z (also memorialized at 12 C.F.R.

SECOND AMENDED COMPLAINT

Part 226).

139.    The legislative history of HOEPA shows that it is effectively aimed at the

problem created by the "Sell & Stay" transactions, including the one at issue here:

> Typically, the homeowners have limited incomes but have
> developed equity in their homes as a result of paying down their first
> mortgages, inheritance, or the rise in real estate values in the 1980's. The
> equity provides security for sizeable second mortgage loans. Because the
> borrowers have little cash flow, however, they must often struggle to meet
> overwhelming mortgage payments. In some instances, the struggle
> culminates in the borrower's loss of his or her home through foreclosure.
>
> Evidence suggests that some home improvement contractors,
> second mortgage brokers, and other lenders act in a "predatory" fashion,
> targeting unsophisticated, low income homeowners and "skimming" equity
> from the neighborhoods through high-rate, high fee loans.

S. Rep. No. 103–169, at 22 (1994), reprinted in 1994 U.S.C.C.A.N. 1881, 1906.

140.    Mr. Hughes has a right to rescission, pursuant to 15 U.S.C. § 1635(a). "[I]n

the case of any consumer credit transaction . . . in which a security interest . . . is or will be

retained or acquired in any property which is used as the principal dwelling of the person to

whom credit is extended, the obligor shall have the right to rescind the transaction" within

certain enumerated timeframes. 15 U.S.C. § 1635(a); *see also* 12 C.F.R. § 1026.23(a)(1).

"The creditor shall clearly and conspicuously disclose, in accordance with regulations of the

Bureau, to any obligor in a transaction subject to this section the rights of the obligor under

this section." 15 U.S.C. § 1635(a). "The creditor shall also provide, in accordance with

regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind

any transaction subject to this section." *Id.*

141.    Mr. Hughes, a natural person, is a consumer. Mr. Hughes used and uses the

property at issue primarily for personal purposes. He lives in the house as his primary

SECOND AMENDED COMPLAINT

residence. *See* 15 U.S.C. § 1602(i) (defining "consumer"); 12 C.F.R. § 1026.2(11) (defining

"consumer"), (12) (defining "consumer credit").

142.    The house—a single family home—is a dwelling. *See* 15 U.S.C. § 1602(w)

(defining "dwelling"); 12 C.F.R. § 1026.2(19) (defining "dwelling").

143.    Through the transaction, Defendant EK extended credit. Mr. Hughes received

the right to defer payment to get title to his home back for personal purposes. *See* 15 U.S.C.

§ 1602(f) (defining "credit"); 12 C.F.R. § 1026.2(12) (defining "consumer credit"), (14)

(defining "credit").

144.    This was not a residential mortgage for the initial acquisition of the home.

Mr. Hughes first purchased the home in 2006. *See* 15 U.S.C. § 1602(x) (defining "residential

mortgage transaction").

145.    Defendant EK secured the credit with Mr. Hughes' principal dwelling. *See*

12 C.F.R. § 1026.2(25) (defining "security interest"); 12 C.F.R. § 1026.23(a)(1) (explaining

that where a security interest is acquired in the consumer's principal dwelling, the consumer

with an ownership interest shall have the right to rescind).

146.    At all relevant times, Defendant EK has qualified as a creditor for purposes

of the Act as it effectively has regularly extended consumer credit subject to a finance

charge and as it was the entity to which the obligation was initially payable. *See* 15 U.S.C.

§ 1602(g) (defining "creditor"); 12 C.F.R. § 1026.2(17) (defining "creditor"). Defendant EK

regularly extends consumer credit for which the payment of a finance charge is or may be

required and Defendant EK is the entity to whom the debt arising from the consumer credit

transaction is initially payable according to the documents. *See* 15 U.S.C. § 1602(g)

(defining "creditor"). In addition and alternatively, upon information and belief, Defendant

SECOND AMENDED COMPLAINT

EK extended credit other than credit subject to the requirements of 12 C.F.R. § 1026.32

more than 25 times (or more than 5 times for transactions secured by a dwelling) in (a) 2020

and/or (b) 2021 prior to the transaction at issue. *See* 12 C.F.R. § 1026.2(17)(v). Alternatively

and in addition, Defendant EK has originated two or more mortgages in a 12-month period.

*See* 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(17)(v).

147.    As part of the transaction, Defendant EK failed to give notice of the right to

rescind. *See* 15 U.S.C. § 1635(a) (requiring clear and conspicuous disclosure and provision

of appropriate forms); 12 C.F.R. § 1026.23(b) (describing the disclosure requirements,

including delivery of two copies of the notice of the right to rescind on a separate

document). Mr. Hughes did not receive two copies in a separate document with clear and

conspicuous disclosures in the proper form.

148.    Defendant EK also failed to give the required material disclosures. *See*

15 U.S.C. § 1635(a) (requiring material disclosures); 15 U.S.C. § 1602(v) (defining

"material disclosures"); 12 C.F.R. § 1026.23(a)(3)(ii) (defining "material disclosures").

Defendant EK was required to disclose, among other things, the annual percentage rate. *See*

15 U.S.C. § 1602(v); 12 C.F.R. § 1026.23(a)(3)(ii). Defendant EK was also required to give

the disclosures laid out in 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c)-(d). *See*

15 U.S.C. § 1602(v); 12 C.F.R. § 1026.23(a)(3)(ii).

149.    Defendant EK failed on all accounts. Defendant EK did not disclose the

annual percentage rate. Mr. Hughes did not receive the disclosure: "You are not required to

complete this agreement merely because you have received these disclosures or have signed

a loan application. If you obtain this loan, the lender will have a mortgage on your home.

You could lose your home, and any money you have put into it, if you do not meet your

29-     SECOND AMENDED COMPLAINT

obligations under the loan." *See* 15 U.S.C. § 1639(a); 12 C.F.R. § 1026.32(c). Defendant EK failed to give other required disclosures as outlined in 15 U.S.C. § 1602(v), 12 C.F.R. § 1026.23(a)(3)(ii), and 12 C.F.R. § 1026.32(c)-(d).

150.    Further, Defendant EK failed to comply with 15 U.S.C. § 1639, as outlined in Claims Five through Nine. *See* 15 U.S.C. § 1639(n) ("Any mortgage that contains a provision prohibited by this section shall be deemed a failure to deliver the material disclosures required under this title" for the purpose of 15 U.S.C. § 1635.).

151.    If a consumer is not provided with two copies of the notice of right to cancel as required by 15 U.S.C. § 1635(a); if the creditor did not give the required material disclosures; and/or if the creditor violated 15 U.S.C. § 1639, such as by giving a loan containing prepaid payments, the consumer's right to cancel the transaction extends to three years. *See* 15 U.S.C. § 1635(f). Defendant EK violated all three provisions.

152.    Mr. Hughes exercised his right to rescission within three years. On July 29, 2024, Mr. Hughes gave notice in writing to Defendant EK that he was exercising his right to rescission. On July 31, 2024, Defendant EK received the rescission notice but failed to honor Mr. Hughes' right of rescission, as required by 15 U.S.C. § 1635(b). *See* 15 U.S.C. § 1635(b) ("Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction."). Months have passed and Defendant EK still holds title to Mr. Hughes' house.

153.    In sum, Mr. Hughes satisfies the requirements of 15 U.S.C. § 1635(a) and is exactly the type of consumer that the Act was meant to protect. He has a right to rescission.

30-    SECOND AMENDED COMPLAINT

154.    As a result of Defendant EK's failure to respond properly to Mr. Hughes'
rescission notice, Defendant EK is liable to him pursuant to 15 U.S.C. §§ 1635(a) and 1640(a)
for:

      a.    rescission of the transaction;

      b.    termination of any security interest in Mr. Hughes' property created under the
transaction;

      c.    statutory damages of $4,000.00, pursuant to 15 U.S.C.
§ 1640(a)(2)(A)(iv), for Defendant EK's failure to comply with its duties
under TILA with respect to Mr. Hughes' rescission of the transaction; and

      d.    reasonable attorney's fees and costs.

## PLAINTIFF'S FIFTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1639(a)-(b)

155.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint
as if fully restated herein.

156.    The Act requires that, for a high-cost mortgage, a creditor must give certain
disclosures not less than three business days prior to the consummation of the transaction.
*See* 15 U.S.C. § 1639(a)-(b). Defendant EK failed to provide the required disclosures.

157.    Congress imposed the disclosure requirements to ensure that consumers
understand the terms of high-cost loans and to protect them from high pressure sales tactics. The
notice must contain an important warning about the possibility that the consumer may lose his or
her home and specific price tag information such as the annual percentage rate and the monthly
payment. The deprivation of this important information before closing constitutes an

SECOND AMENDED COMPLAINT

informational injury. The information is not simply of general public interest but directly concerns the individual consumer entitled to it. Congress placed these statutory duties upon creditors specifically for the benefit of individual consumers. The disclosures are central to warning consumers accurately about the risks of the high-cost loan offered to them three days before the closing.

158.    Defendant EK failed to provide those disclosures.

159.    Defendant EK was required to give those disclosures because the instant transaction was a high-cost mortgage. *See* 15 U.S.C. § 1639(a)(1) (explaining that the requirements of 15 U.S.C. § 1639 apply to high-cost mortgages); 15 U.S.C. § 1602(bb) (defining "high-cost mortgage"); *see also* 12 C.F.R. § 1026.32 (outlining requirements for high-cost mortgages).

160.    A high-cost mortgage is "a consumer credit transaction that is secured by the consumer's principal dwelling, other than a reverse mortgage transaction, if *inter alia* (1) the credit transaction is secured by "a first mortgage on the consumer's principal dwelling" and "the annual percentage rate at consummation of the transaction will exceed by more than 6.5 percentage points . . . the average prime offer rate, as defined in section 1639c(b)(2)(B) of this title, for a comparable transaction" or (2) "the total points and fees payable in connection with the transaction, other than bona fide third party charges not retained by the mortgage originator, creditor, or an affiliate of the creditor or mortgage originator, exceed" five percent of the total transaction amount for transactions for $20,000 or more. 15 U.S.C. § 1602(bb)(1)(A)(i)-(ii).

161.    The transaction here was a consumer credit transaction secured by Mr. Hughes' principal dwelling. Mr. Hughes restates paragraphs 141 to 145.

32-      SECOND AMENDED COMPLAINT

162.     The instant transaction was a first mortgage on Mr. Hughes' principal dwelling, and the annual percentage rate at consummation of the transaction exceeded 6.5 percentage points the average prime offer rate for a comparable transaction. *See* 15 U.S.C. § 1602(bb)(1)(A)(i)(I).

163.     The initial Annual Percentage Rate ("APR") of the loan was at least 60 percent ($61,131.17 interest on day one / $99,305.83 the principal). *See* 15 U.S.C. § 1602(bb)(1)(B) (explaining how to determine the annual percentage rate).

164.     On information and belief, at the time that the effective interest rate for Mr. Hughes' transaction was set, the average prime offer rate ("APOR") for a fixed-rate loan was no greater than four percent. *See* 15 U.S.C. § 1639c(b)(2)(B) (defining "average prime offer rate").

165.     The result of subtracting the above-mentioned APOR from Mr. Hughes' effective APR results in a figure of greater than 6.5%. Accordingly, this was a high-cost mortgage.

166.     Further, the total points and fees for the transaction exceed five percent of the total transaction amount. *See* 15 U.S.C. § 1602(bb)(1)(A)(ii) (defining "high-cost mortgage"); 12 C.F.R. § 1026.32(b) (defining "points and fees" by reference to the finance charge under 12 C.F.R. § 1026.4(a) and (b)).

167.     For Mr. Hughes to "unlock" his equity of $99,305.83, Defendant EK withheld, *inter alia*, a processing fee of $12,012.00 (4% of the purchase price), more than two years of monthly "rent" payments for a total of $39,856.77[1] (12% of the purchase price), and a "repair holdback" of $6,500.00 (2% of the purchase price).

168.     The processing fee, withheld monthly payments, and repair holdback, totaling

---

[1] $37,920 for twenty-four months of "rent," $1,580 for September 2021 "rent," and $356.77 for August 2021 prorated "rent."

$58,368.77, constitute finance charges pursuant to the Act—these amounts constitute charges

that Mr. Hughes was required to pay as a condition of Defendant EK making the equitable

mortgage loan. *See* 15 U.S.C. § 1605(a) (defining "finance charge"); 12 C.F.R. § 1026.4(a)

("The finance charge is the cost of consumer credit as a dollar amount. It includes any charge

payable directly or indirectly by the consumer and imposed directly or indirectly by the

creditor as an incident to or a condition of the extension of credit.").

169.    The total loan amount is the amount financed minus certain enumerated costs

that are points and fees and financed by the creditor. *See* 12 C.F.R. § 1026.32(b)(4)

(explaining how to calculate the total loan amount for a closed-end credit transaction).

170.    The amount financed was the $99,305.83 in the equity Mr. Hughes "unlocked."

*See* 12 C.F.R. § 1026.18(b) (explaining how to calculate the amount financed).

171.    The points and/or fees of the transaction, which included but were not limited to

the processing fee, withheld monthly payments, and repair holdback, constituted more than

five percent of the total loan amount, as that term is defined in 12 C.F.R. § 1026.32(b)(4).

Accordingly, this was a high-cost mortgage.

172.    Because this was a high-cost mortgage, Defendant EK was obligated under the

Act to give the required disclosures. *See* 15 U.S.C. § 1639(a)(1). Defendant EK was obligated

to give the disclosures no less than three business days prior to consummation of the

transaction. *See id.* § 1639(b); 12 C.F.R. § 1026.31(c). Defendant EK was required to make the

disclosures in clear and conspicuous writing. *See* 15 U.S.C. § 1639(a)(1);

12 C.F.R. § 1026.31(b).

173.    Mr. Hughes did not receive the required disclosures. He was not advised,

"You are not required to complete this agreement merely because you have received these

SECOND AMENDED COMPLAINT

... 

disclosures or have signed a loan application." He was not advised, "If you obtain this loan,

the lender will have a mortgage on your home. You could lose your home, and any money

you have put into it, if you do not meet your obligations under the loan." *See*

15 U.S.C. § 1639(a)(1)(A)-(B); 12 C.F.R. § 1026.32(c)(1). He was not advised of the annual

percentage rate of interest, or the other listed disclosure requirements. *See*

15 U.S.C. § 1639(a)(2); 12 C.F.R. § 1026.32(c).

174.    In sum, Defendant EK failed to provide, three business days before the

transaction as required by 15 U.S.C. § 1639(b), the disclosures required by 15 U.S.C.

§ 1639(a) and 12 C.F.R. §§ 1026.31 and 1026.32.

175.    Because Defendant EK failed to give numerous required disclosures, Mr.

Hughes is entitled to $4,000.00 in statutory damages pursuant to 15 U.S.C.

§ 1640(a)(2)(A)(iv). Because Defendant EK failed to give the required disclosures three

business days before the consummation of the transaction, Mr. Hughes is entitled to an

additional $4,000.00 in statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv).

176.    Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See*

15 U.S.C. § 1640(a)(4).

177.    Mr. Hughes is entitled to reasonable attorney's fees.

**PLAINTIFF'S SIXTH CLAIM FOR RELIEF**

**Violations of TILA, as amended by HOEPA – Against Defendant EK**
**15 U.S.C. § 1639(g)**

178.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint

as if fully restated herein.

179.    The Act prohibits prepaid payments: a high-cost mortgage "may not include

SECOND AMENDED COMPLAINT

terms under which more than 2 periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the consumer." *See* 15 U.S.C. § 1639(g); *see also* 12 C.F.R. § 1026.32(d)(3). Defendant EK extracted prepaid payments.

180. The instant transaction was a high-cost mortgage. Mr. Hughes re-alleges paragraphs 159 to 171.

181. The transaction included terms under which more than two periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the consumer. Here, Defendant EK consolidated and extracted in advance more than twenty-four monthly payments, over two years of "rent," from the payment price. In other words, instead of paying Mr. Hughes an additional $39,856.77 ($37,920 for twenty-four months of "rent," $1,580 for September 2021 "rent," and $356.77 for August 2021 prorated "rent"), Defendant EK withheld periodic payments from the loan proceeds.

182. In sum, the high-cost mortgage transaction unlawfully included a prepaid payment, a term under which more than two monthly payments required under the transaction were consolidated and paid in advance from the transaction proceeds. *See* 15 U.S.C. § 1639(g); 12 C.F.R. § 1026.32(d)(3).

183. Mr. Hughes is entitled to $4,000.00 in statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv).

184. Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See* 15 U.S.C. § 1640(a)(4).

185. Mr. Hughes is entitled to reasonable attorney's fees.

*///*

36-     SECOND AMENDED COMPLAINT

## PLAINTIFF'S SEVENTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1639(h)

186.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

187.    The Act forbids creditors of high-cost mortgages from engaging in "a pattern or practice of extending credit . . . based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations and employment." 15 U.S.C. § 1639(h).

188.    The transaction is a higher-priced mortgage loan and a high-cost mortgage as both of the terms are defined by the Act. Mr. Hughes re-alleges paragraphs 159 to 171.

189.    In violation of the Act, through its "Sell & Stay" scheme, Defendant EK has engaged for years in a pattern and practice of extending credit to homeowners based solely on the amount of equity in their homes, *i.e.*, their collateral, without regard to their repayment ability. To the contrary, Defendant EK targets low-income consumers unlikely to be able to get a HELOC and unlikely to be able to pay Defendant EK's exorbitant option price.

190.    This unlawful pattern and practice of lending money to consumers based only on the value of their collateral, and without regard to their ability to repay, is Defendant EK's standard operating procedure and regular practice with respect to the "Sell & Stay" transactions.

191.    On information and belief, each of the transactions that Defendant EK entered into was based only on the amount of equity in the borrowers' homes and without regard to the borrowers' ability to repay.

37-    SECOND AMENDED COMPLAINT

192.    Defendant EK's pattern and practice of extending credit based on the amount of equity in the borrower's home, and not based on their ability to repay, is further established by EasyKnock's own public statements, including the statement on its website that in qualifying for "Sell & Stay" transactions, homeowners should "Forget Credit Score or DTI [debt-to-income] Requirements" and that "Credit scores and debt-to-income (DTI) ratios don't hold you back with EasyKnock's solutions." Credit scores and debt- to-income ratios, however, are designed to assist in determining borrowers' ability to repay loans.

193.    Further, EasyKnock stated that homeowners can access their home equity and "Avoid Lender Restrictions."

194.    Defendant EK engaged in a pattern and practice of extending credit to homeowners based solely on the amount of equity in their homes, i.e., their collateral, without regard to their repayment ability.

195.    Mr. Hughes is entitled to $4,000.00 in statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv).

196.    Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See* 15 U.S.C. § 1640(a)(4).

197.    Mr. Hughes is entitled to reasonable attorney's fees.

### PLAINTIFF'S EIGHTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1639(u)

198.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

199.    The Act prohibits creditors from "extend[ing] credit to a consumer under a

SECOND AMENDED COMPLAINT

high-cost mortgage without first receiving certification from a counselor that is approved by the Secretary of Housing and Urban Development, or at the discretion of the Secretary, a State housing finance authority, that the consumer has received counseling on the advisability of the mortgage." 15 U.S.C. § 1639(u); *see also* 12 C.F.R. § 1026.34(a)(5). "Such counselor shall not be employed by the creditor or an affiliate of the creditor or be affiliated with the creditor." *Id.* Defendant EK extended credit to Mr. Hughes even though Mr. Hughes had not received pre-loan counseling and Defendant EK had not received the required certification.

200.    The instant transaction was a high-cost mortgage. Mr. Hughes re-alleges paragraphs 159 to 171.

201.    Mr. Hughes never received pre-loan counseling from an approved counselor.

202.    Instead, he was advised by Defendant EK's agents that he would be able to keep his home and that he was merely "unlocking his equity" in it.

203.    In sum, Defendant EK entered into the transaction without first obtaining written certification that Mr. Hughes obtained counseling on the advisability of the transaction from a counselor or Oregon's housing finance authority, as required by 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5).

204.    Mr. Hughes is entitled to $4,000.00 in statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv).

205.    Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See* 15 U.S.C. § 1640(a)(4).

206.    Mr. Hughes is entitled to reasonable attorney's fees.

*///*

39-        SECOND AMENDED COMPLAINT

## PLAINTIFF'S NINTH CLAIM FOR RELIEF

**Violations of TILA, as amended by HOEPA – Against Defendant EK**
**15 U.S.C. § 1639(r)**

207.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

208.    The Act prohibits taking any action in connection with a high-cost mortgage "to structure a loan transaction as an open-end credit plan or another form of loan for the purpose and with the intent of evading the provisions of this subchapter" or "to divide any loan transaction into separate parts for the purpose and with the intent of evading provisions of this subchapter." 15 U.S.C. § 1639(r).

209.    The instant transaction was a high-cost mortgage. Mr. Hughes re-alleges paragraphs 159 to 171.

210.    Here, Defendant EK divided the transaction into multiple parts. It labeled each part with a different title, signing the parts in stages.

211.    EasyKnock, on behalf of Defendant EK, advertised that homeowners could access their home equity and "Avoid Lender Restrictions." EasyKnock stated on its website that, in qualifying for the loan, homeowners should "Forget Credit Score or DTI [debt-to-income] Requirements" and that "Credit scores and debt-to-income (DTI) ratios don't hold you back with EasyKnock's solutions."

212.    Defendant EK, at the direction of Defendant Kessler, intentionally structured the predatory mortgages into multi-part transactions with the intent of avoiding the oversight and regulations that apply to high-cost mortgages. They explicitly advised homeowners that the scheme would avoid lender restrictions.

SECOND AMENDED COMPLAINT

213.    Mr. Hughes is entitled to $4,000.00 in statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv).

214.    Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See* 15 U.S.C. § 1640(a)(4).

215.    Mr. Hughes is entitled to reasonable attorney's fees.

## PLAINTIFF'S TENTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1639b(b)

216.    Mr. Hughes restates and re-alleges the foregoing allegations of this Complaint as if fully restated herein.

217.    The Act places a duty of care on mortgage originators. It requires mortgage originators to "be qualified and, when required, registered and licensed as a mortgage originator in accordance with applicable State or Federal law[.]" 15 U.S.C. § 1639b(b)(1)(A).

218.    Defendant EK is a mortgage originator. *See* 15 U.S.C. § 1602(dd)(2) (defining "mortgage originator"); 12 C.F.R. § 1026.36(a)(1) (defining "loan originator"). Defendant EK facilitated the financing of the transaction. Defendant EK applied for and received a mortgage from Temple View Capital Funding LP.

219.    Defendant EK directly gained from the transaction. It received title to Mr. Hughes' home and the difference between the mortgage from Temple View Capital Funding LP and the amount that they loaned to Plaintiff. On information and belief, Defendant EK used that money to invest in other properties through a similar predatory mortgage scam.

220.    Defendant EK failed to be qualified, registered, or licensed as a mortgage

originator.

221.    Mr. Hughes is entitled to three times the total amount of direct gain accrued

by Defendant EK in connection with the predatory loan. *See* 15 U.S.C. § 1639b(d).

222.    Mr. Hughes is entitled to reasonable attorney's fees.

## PLAINTIFF'S ELEVENTH CLAIM FOR RELIEF

### Violations of TILA, as amended by HOEPA – Against Defendant EK
### 15 U.S.C. § 1639c

223.    Mr. Hughes restates and re-alleges the foregoing allegations of this

Complaint as if fully restated herein.

224.    The Act prohibits creditors from making a residential mortgage loan without

making a "reasonable and good faith determination based on verified and documented

information that, at the time the loan is consummated, the consumer has a reasonable ability

to repay the loan, according to its terms, and all applicable taxes, insurance (including

mortgage guarantee insurance), and assessments." 15 U.S.C. § 1639c(a)(1). "A

determination under this subsection of a consumer's ability to repay a residential mortgage

loan shall include consideration of the consumer's credit history, current income, expected

income the consumer is reasonably assured of receiving, current obligations, debt-to-income

ratio or the residual income the consumer will have after paying non-mortgage debt and

mortgage-related obligations, employment status, and other financial resources other than

the consumer's equity in the dwelling or real property that secures repayment of the loan."

15 U.S.C. § 1639c(a)(3). "A creditor making a residential mortgage loan shall verify

amounts of income or assets that such creditor relies on to determine repayment ability,

including expected income or assets, by reviewing the consumer's Internal Revenue Service

SECOND AMENDED COMPLAINT

Form W–2, tax returns, payroll receipts, financial institution records, or other third-party

documents that provide reasonably reliable evidence of the consumer's income or assets."

15 U.S.C. § 1639c(a)(4).

225.    Defendant EK qualifies as a creditor. *See* 15 U.S.C. § 1602(g).

226.    Defendant EK extended a residential mortgage loan. *See* 15 U.S.C.

§ 1602(dd)(5).

227.    Defendant EK entered into the transaction without first making a reasonable

and good faith determination at or before consummation of the transaction that Mr. Hughes

had a reasonable ability to repay what he owed under the transaction. Among other things, it

did not reasonably and in good faith determine that he was able to make his monthly

payments. His monthly income in 2021 was limited to Supplemental Security Income in the

amount of $794. His monthly payments were initially set at an amount nearly double this, or

$1,580. After using up the funds set aside for the lease payments in the transaction, he has

been able to avoid eviction only because Defendant EK agreed to credit him with making

payments in exchange for increasing the total he must now pay to re-take title to his home

by the same amount.

228.    Defendant EK did not consider Plaintiff's credit history or other financial

resources. Instead, it only took into account his equity in the house.

229.    Mr. Hughes is entitled to $4,000.00 in statutory damages pursuant to

15 U.S.C. § 1640(a)(2)(A)(iv).

230.    Further, Mr. Hughes is entitled to the sum of all finance charges and fees. *See*

15 U.S.C. § 1640(a)(4).

231.    Mr. Hughes is entitled to reasonable attorney's fees.

SECOND AMENDED COMPLAINT

## PLAINTIFF'S TWELFTH CLAIM FOR RELIEF

### Fraudulent Filing of Information Returns – Against Defendant EK
### 26 U.S.C. § 7434

232.    Mr. Hughes restates and re-alleges the foregoing allegations of this

Complaint as if fully restated herein.

233.    26 U.S.C. § 7434 allows any person to bring a civil action for damages

against any other person who "willfully files a fraudulent information return with respect to

payments purported to be made" to them. Defendants willfully filed a fraudulent information

return.

234.    Congressional history reveals that 26 U.S.C. § 7434 was designed

specifically to afford a damages remedy for victims of the filing of false information returns

overstating a person's income and that misrepresent the amount of payments made, as is the

case here.

235.    Defendant EK filed an information return. Form 1099-S is an information

return.

236.    A 1099-S is required for any "transaction that consists in whole or in part of

the sale or exchange for money, indebtedness, property, or services of any . . . [i]nherently

permanent structures, including any residential . . . building." Internal Revenue Service,

*Instructions for Form 1099-S* (April 2025), *available at* https://www.irs.gov/instructions/

i1099s.

237.    According to the terms of the transaction, Defendant EK undertook the

responsibility of filing the 1099-S to report the transaction between Defendants and Mr.

Hughes. The transaction stated, "AFFIDAVITS/1099 REPORTING:" "Unless otherwise

44-    SECOND AMENDED COMPLAINT

provided, the BUYER agrees to execute and file a Form 1099 Report in connection with the Purchase and Sale of Real Estate as may be applicable to the transaction contemplated herein, and the SELLER must provide information relevant thereto." Defendant EK is the "buyer."

238.    Defendant EK executed and filed the form by reporting the relevant information and making payments to ClearEdge Title.

239.    Defendant EK willfully issued a fraudulent information return.

240.    To complete a 1099-S, the Internal Revenue Service ("IRS") instructs to "[e]nter the gross proceeds from the sale or exchange of real estate. Gross proceeds means any cash received or to be received for the real property by or on behalf of the transferor, including the stated principal amount of a note payable to or for the benefit of the transferor and including a note or mortgage paid off at settlement." Internal Revenue Service, *Instructions for Form 1099-S* (April 2025), *available at* https://www.irs.gov/instructions/ i1099s. "Gross proceeds do not include the value of property or services received or to be received by, or on behalf of, the transferor. . . ." *Id.* "Do not reduce gross proceeds by any expenses paid by the transferor, such as sales commissions, deed preparation, advertising, and legal expenses." *Id.* "If the transferor received or will receive property (other than cash and consideration treated as cash in figuring gross proceeds) or services as part of the consideration for the property, enter an 'X' in the checkbox in box 4." *Id.*

241.    Here, Defendant EK willfully and fraudulently misreported $343,200.00 as gross proceeds, an amount that does not reflect the cash or notes payable received by Mr. Hughes.

242.    Defendant EK included an option value of $183,200 in the gross proceeds

SECOND AMENDED COMPLAINT

listed on the 1099-S even though an option is not cash or a cash equivalent.

243.    Defendant EK knew that Mr. Hughes did not receive $343,200.00 in cash, and intentionally reported it anyway.

244.    In fact, Defendant EK required Mr. Hughes to complete a "Substitute Form 1099-S Proceeds from Real Estate Transactions" form as part of the transaction. Defendant EK prepared the form. Defendant EK left the space for gross proceeds blank. Then, Defendant EK directed Mr. Hughes to sign the blank form.

245.    By leaving the form blank, Defendant EK hid from Mr. Hughes how they intended to characterize the gross proceeds on the tax documents.

246.    Then, Defendant EK mischaracterized the gross proceeds on tax documents, listing the gross proceeds as $343,200.00.

247.    The subsequent 1099-S that Mr. Hughes received by mail did not match what Mr. Hughes had signed. Mr. Hughes was astonished, distraught, and insulted when he received the 1099-S in the mail following the transaction.

248.    Even if the option value could be considered a cash equivalent, the contract had been carefully crafted by Defendants to overstate the option value. Defendant EK claims that the option had a value of $183,200.00, presumably based on the fair market value of the property ($343,200.00), minus cash and benefits paid and fees paid to third parties (including Defendants and their agents), resulting in a residual amount of $183,200.00.

249.    However, the valuation of the option at $183,200 was merely a strategy to increase its tax basis.

250.    Mr. Hughes is entitled to $5,000.00 in statutory damages pursuant to 26 U.S.C. § 7434(b).

46-        SECOND AMENDED COMPLAINT

251.    Mr. Hughes is entitled to reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Hughes prays that this Court:

1.    Assume jurisdiction of this case;

2.    On Mr. Hughes' First Claim for Relief (financial abuse of a vulnerable person), award a judgment against Defendant EK:

a.    for an amount equal to three times his economic damages, $310,960.60, or $500.00, whichever amount is greater;

b.    for an amount equal to three times his non-economic damages, amount to be determined at trial;

c.    for an award for punitive damages, amount to be determined at trial;

d.    ordering that that the transaction is rescinded and the security interest is terminated;

e.    ordering that Defendant EK shall take all action necessary to terminate any security or other interest in Mr. Hughes' property created under the transaction, that all such interests are void, and that Mr. Hughes is not liable for any "rent" or lease-related charges;

f.    ordering that Defendant EK is enjoined during the pendency of this action, and permanently thereafter, from instituting any actions to dispossess Mr. Hughes of his property or any rights therein, from recording any deeds regarding the property or from otherwise taking any steps to deprive him of his possession of that property or any rights therein;

47-    SECOND AMENDED COMPLAINT

g.      ordering that if Mr. Hughes has a duty to tender any proceeds of the transaction, his tender obligation, including its amount, total no more than $99,305.83 and be determined in light of all of his claims and that Defendant EK shall accept tender on reasonable terms and over a reasonable period of time;

h.      for reasonable attorney's fees;

i.      for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1); and

j.      for such further relief as this Court may deem necessary or proper.

3.      On Mr. Hughes' Second Claim for Relief (financial abuse of a vulnerable person), award a judgment against Defendant Kessler:

a.      for an amount equal to three times his economic damages, $310,960.60, or $500.00, whichever amount is greater;

b.      for an amount equal to three times his non-economic damages, amount to be determined at trial;

c.      ordering that that the transaction is rescinded and the security interest is terminated;

d.      ordering that Defendants shall take all action necessary to terminate any security or other interest in Mr. Hughes' property created under the transaction, that all such interests are void, and that Mr. Hughes is not liable for any "rent" or lease-related charges;

e.      ordering that Defendants are enjoined during the pendency of this action, and permanently thereafter, from instituting any actions to dispossess

48-     SECOND AMENDED COMPLAINT

Mr. Hughes of his property or any rights therein, from recording any deeds regarding the property or from otherwise taking any steps to deprive him of his possession of that property or any rights therein;

    f.    ordering that if Mr. Hughes has a duty to tender any proceeds of the transaction, his tender obligation, including its amount, total no more than $99,305.83 and be determined in light of all of his claims and that Defendant EK shall accept tender on reasonable terms and over a reasonable period of time;

    g.    for reasonable attorney's fees;

    h.    for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1); and

    i.    for such further relief as this Court may deem necessary or proper.

    4.    On Mr. Hughes' Third Claim for Relief (declaratory relief), award a judgment against Defendants:

    a.    ordering that the transaction be declared an equitable residential home mortgage and not a deed absolute for all purposes of this action, including but not limited to for purposes of determining the parties' obligations, rights and remedies under TILA;

    b.    ordering that Mr. Hughes retains an equitable ownership interest in the property

    c.    for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1); and

    d.    for such further relief as this Court may deem necessary or proper.

49-    SECOND AMENDED COMPLAINT

5.      On Mr. Hughes' Fourth Claim for Relief (TILA, as amended by HOEPA, 15 U.S.C. § 1635), award a judgment against Defendant EK:

      a.      ordering that he has validly rescinded his loan under the Act and the security interest is terminated;

      b.      ordering that Defendant EK shall take all action necessary to terminate any security interest in Mr. Hughes' property created under the transaction and that all such security interests are void;

      c.      for statutory damages of $4,000.00, attorney's fees, and costs pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv);

      d.      ordering that Defendant EK is enjoined during the pendency of this action, and permanently thereafter, from instituting any actions to dispossess Mr. Hughes of his property or any rights therein, from recording any deeds regarding the property or from otherwise taking any steps to deprive him of his possession of that property or any rights therein;

      e.      ordering that, because Defendant EK failed to respond to Mr. Hughes' notice of rescission, he has no duty to tender, but in the alternative, if tender is required, determine the amount of the tender obligation in light of all of Mr. Hughes' claims, and that Defendant EK shall accept tender on reasonable terms and over a reasonable period of time;

      f.      for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1); and

      g.      for such further relief as this Court may deem necessary or proper.

6.      On Mr. Hughes' Fifth through Ninth Claims and Eleventh Claim for Relief

50- SECOND AMENDED COMPLAINT

(TILA, as amended by HOEPA, 15 U.S.C. §§ 1639, 1639c), award a judgment against

Defendant EK:

     a.    for statutory damages of $4,000.00 for each violation, attorney's fees,

     and costs pursuant to 15 U.S.C. § 1640(a)(2)(A)(iv);

     b.    for the sum of all finance charges and fees pursuant to 15 U.S.C. § 1640(a)(4);

     c.    for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1);

     and

     d.    for such further relief as this Court may deem necessary or proper.

7.    On Mr. Hughes' Tenth Claim for Relief (TILA, as amended by HOEPA,

15 U.S.C. § 16399b), award a judgment against Defendant EK:

     a.    for three times the total amount of direct gain accrued by Defendant EK

       in connection with the predatory loan pursuant to 15 U.S.C. § 1639b(d);

     b.    for reasonable attorney's fees;

     c.    for reasonable costs of the action pursuant to Fed. R. Civ. Proc. 54(d)(1);

     and

     d.    for such further relief as this Court may deem necessary or proper.

8.    On Mr. Hughes' Twelfth Claim for Relief (Fraudulent Filing of Information

Return), award a judgment against Defendant EK:

     a.    For $5,000.00 in statutory damages pursuant to 26 U.S.C. § 7434(b);

     b.    for reasonable costs and attorney's fees; and

     c.    for such further relief as this Court may deem necessary or proper.

///

    SECOND AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Mr. Hughes hereby demands trial by jury.


DATED this 15th day of July, 2025.          Respectfully submitted,

                                            /s/ *Monet Gonnerman*
                                            Monet Gonnerman, OSB No. 224045
                                            mgonnerman@oregonlawcenter.org
                                            Emily Teplin Fox, OSB No. 121720
                                            efox@oregonlawcenter.org
                                            OREGON LAW CENTER
                                            621 SW Morrison St., Suite 1450
                                            Portland, OR 97205
                                            Noah Wallis, OSB 226764
                                            noah.wallis@lasoregon.org
                                            LEGAL AID SERVICES OF OREGON
                                            621 SW Morrison St., Suite 900
                                            Portland, OR 97205


                                            Of Attorneys for Plaintiff, Gregory R. Hughes